IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

Filed/Docketed
Mar 16, 2023

IN RE:

JTG VENTURES, LLC,

           Debtor.

Case No. 22-10966-M
Involuntary Chapter 7

## MEMORANDUM OPINION

*"Litigation solves everything."*[1]

    Known best for his performances as a comic actor, we must assume that Mr. Cryer's statement is an exercise in humor, sarcasm, or both. Lawyers, judges, and litigants are all painfully aware that litigation is expensive, time consuming, stressful, and, perhaps worst of all, unpredictable. It is also a place where, once the die is cast, there is often no going back and, to use a golfing term, no mulligans.[2]

    Staying in the golfing vernacular, the question in this case is not only whether Steven B. Silverstein ("Silverstein"), the sole petitioning creditor in this involuntary case, should be given a mulligan, but also whether he should be allowed to play on a different course. Silverstein filed an action in state court seeking to recover over a million dollars lost in a failed business transaction. As part of that litigation, he sought and obtained the appointment of a receiver to help recover the monies lost. The receiver performed his duties and is prepared to sell the assets available to him, the net proceeds of which should be available to satisfy Silverstein's judgment, at least in part.

---

[1] A quote attributed to Jon Cryer by the web site BrainyQuotes. *See* https://www.brainyquote.com/topics/litigation-quotes. Mr. Cryer is an American actor perhaps best known for his breakout role in *Pretty in Pink* and his portrayal of Alan Harper on *Two and a Half Men*, a situation comedy which aired on CBS from 2003 to 2105.

[2] "A free shot given a golfer in informal play when the previous shot was poorly played." *See* https://www.merriam-webster.com/dictionary/mulligan.

Silverstein, now unhappy with the progress made by the receiver appointed at his request, asks this Court to take over, and for the game to be played on the new course that is Chapter 7 of the United States Bankruptcy Code. The question asked by this Court is whether the litigation should begin anew, or whether this Court should abstain, leaving Silverstein and the receiver in the forum of Silverstein's first choosing.

The following findings of fact and conclusions of law are made pursuant to Federal Rule of Bankruptcy Procedure 7052, made applicable herein by Federal Rule of Bankruptcy Procedure 9014.

## Jurisdiction

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b), and venue is proper pursuant to 28 U.S.C. § 1409.[3] Reference to the Court of this matter is proper pursuant to 28 U.S.C. § 157(a). The issue of whether to abstain from hearing a particular case is a core proceeding as defined in 28 U.S.C. § 157(b)(2)(A).

## Findings of Fact

The record in this case is a study in obscurity and obfuscation. It begins with a dispute between JTG Ventures, LLC ("JTG") and Silverstein. The exact nature of JTG and JTG's business remains a bit of a mystery to this Court. It appears JTG was engaged in some sort of business relating to the sale and or rental of condominiums. Apparently Silverstein was, at one time, involved in the day-to-day operations of JTG, but that involvement ceased in either 2012 or 2014.[4] JTG presently has no assets, no employees, and no business operations. Another individual

---

[3] Unless otherwise noted, all statutory references are to sections of the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq.*
[4] Silverstein originally testified that his last involvement with JTG was in 2014; however, in response to a leading question from his own attorney telling Silverstein that he was last involved with JTG in 2012, Silverstein changed his testimony.

involved in JTG who plays a large role in this story is Jeffrey Wolf ("Mr. Wolf"), who was apparently also deeply involved in JTG.

The relationship between JTG, Silverstein and Mr. Wolf soured. On April 11, 2017, an action was filed in the District Court in and for Tulsa County, Oklahoma, entitled "JTG Ventures, LLC, and Jeffrey Wolf, Plaintiffs vs. Steven B. Silverstein, Defendant" (the "State Court Action").[5] At some time thereafter, Silverstein filed a counterclaim against JTG, Mr. Wolf, Jean Wolf ("Mrs. Wolf"), the wife of Mr. Wolf, and O.R.B. Ltd. ("ORB"). On June 3, 2020, Silverstein filed a motion in the State Court Action seeking the appointment of a receiver "over the assets of JTG Ventures, LLC, J.W. Evergreen Foundation, the Woodside Lane Condominium Project, a/k/a Silver Sands Apartments," all located in Tulsa, Oklahoma.[6] On November 6, 2020, Silverstein got what he asked for. An order was entered in the State Court Action appointing C. David Rhoades ("Rhoades") as receiver over the assets described above.[7] The assets subject to the receivership (and the source of the fight that brings us here today) are 87 condominiums located in the area of 66th and Peoria Streets in the City of Tulsa (the "Peoria Condos").

Shortly after his appointment, Rhoades filed a report in the State Court Action which, among other things, reviewed the issue of who (or what) held legal title to the Peoria Condos.[8] Rhoades determined that title to 84 of the 87 Peoria Condos was held in the name of the Evergreen Family Revocable Trust ("Evergreen") and the remaining three condos were titled in the name of ORB.[9] JTG did not have title to any of the Peoria Condos, a fact which continues to this day.

---

[5] *Exhibit 102*. This exhibit is a copy of a *lis pendens* filed by Silverstein in the State Court Action which happens to include the date of filing. A copy of the petition filed in the State Court Action was not made part of the record herein.
[6] *Exhibit 1*.
[7] *Id.*
[8] *Exhibit 103*.
[9] *Id.* at 5.

The State Court Action continued unabated. On October 13, 2020, Silverstein was granted judgment as a matter of law on his counterclaims as to the issue of liability only, and the matter was set for trial on the issue of damages.[10] A trial by jury of the damages issue took place in October 2021. On October 7, 2021, the jury returned a verdict in favor of Silverstein and against JTG and Mr. Wolf in the amount of $1,200,000 for breach of contract. In addition, the jury returned a verdict of $10,000 in favor of Silverstein and against JTG, Mr. Wolf, Mrs. Wolf, and ORB for "fraud, fraudulent transfer, and [] tortious interference with contract[.]"[11] The jury declined to award any exemplary damages. According to Silverstein's testimony, he was later awarded an additional $439,000 in interest and attorneys' fees; however, this judgment is not part of the record before this Court.

After entry of the State Court Judgment, Rhoades continued to act as receiver. He worked to preserve and market the Peoria Condos, and, with court approval, borrowed approximately $1,000,000 to maintain and improve these properties. Also, in an attempt to deal with the title issues presented in the State Court Action, on May 25, 2022, Rhoades sought and obtained an "Agreed Order Amending and Adding Additional Wolf Related Entities to the Receivership Estate" (the "Agreed Order").[12] Silverstein, through counsel, did not object to admission of the Agreed Order, which contained the following operative provisions:

> IT IS, THEREFORE, ORDERED, ADJUDGED AND DECREED by the Court that the following Wolf Entities shall be added to the Receivership Estate:
>
> - O.R.B., LTD
> - Evergreen Family Revocable Trust
> - JEMW Realty Corp.
> - J.E.M.W. Realty Corp a/k/a JEMW Realty Corp Ventures, LLC

---

[10] *Exhibit 3* (the "State Court Judgment").
[11] *Id.* at 2.
[12] *Exhibit 2*.

- EMA, LLC[13]

On October 11, 2022, Rhoades sought permission in the State Court Action to sell the Peoria Condos (the "Sale Motion"). Under the terms of the Sale Motion, Rhoades will offer the Peoria Condos for sale by auction in early March 2023. Rhoades testified that he has a written offer of $2,750,000 for the Peoria Condos, which he intends to use as a "stalking horse" in the hopes that other bids are received. Once the auction is completed, Rhoades will seek confirmation of the sale in the State Court Action and approval to pay the outstanding loan balance on the monies used to maintain the Peoria Condos and the fees for his services as receiver. The remaining balance will be paid into the State Court Action and ultimately distributed pursuant to further order of the state court.

On the same day Rhoades filed the Sale Motion, Silverstein filed an involuntary Chapter 7 petition against JTG in this Court.[14] Silverstein was the only petitioning creditor, and is, based upon the record before this Court, the **only** creditor of JTG. Silverstein professed to have encountered difficulty in his attempts to serve the involuntary petition,[15] and ultimately obtained an alias summons on November 2, 2022, which was served on the Oklahoma Secretary of State on November 4, 2022.[16]

On October 14, 2022, Rhoades filed a motion for relief from the automatic stay in this case.[17] The basis for the motion was simple: JTG, as of the date of the filing of the involuntary petition, had no right, title, or interest in the Peoria Condos, rendering them (and the State Court Action) not subject to the automatic stay. Silverstein took no issue with Rhoades's position;

---

[13] *Id.* at 2.
[14] *Docket No. 1.*
[15] *Docket No. 10.*
[16] *Docket No. 16.*
[17] *Docket No. 4.*

instead, he argued that the Peoria Condos might be the subject of a fraudulent transfer action whereby they could be brought back into the bankruptcy estate, and that "the stay applies to the continuation of the state court proceedings until we figure out if the property [the Peoria Condos] is coming back into this Court[.]"[18] The Court rejected Silverstein's argument and granted Rhoades the relief he requested.[19] That ruling is presently on appeal to the Bankruptcy Appellate Panel of the Tenth Circuit.[20]

>   After the Court granted Rhoades's motion for relief, it made the following statement:
>
>   I will say one other thing. In looking at this matter -- and I was considering this before today's hearing -- and I think it, it was clear from my comments that I, I'm not sure I know why we're here, especially given the fact that all the parties, the only creditor in the involuntary is involved in the state court litigation over what is the real asset, apparently, which were these Condominiums.
>
>   So I'm going to review the matter further, but I think the parties should expect that I will be issuing an order setting a hearing requiring the petitioning creditor to show cause why under Section 305 of the Code I should not abstain from hearing this case and leave you folks [with] the state court to resolve what is, basically, a one,

---

[18] *Transcript of Proceedings Held on November 8, 2022, Docket No. 34*, page 54, lines 14 – 17. *See also Response to Motion for Relief Frm [sic] Automatic Stay, Abandonment of Property, and Waiver of Rule 4001 filed by Steven B. Silverstein, Creditor, Docket No. 6*, at 3 ("While the real property may not be part of the bankruptcy estate at this time, the claims based on fraudulent transfers in Tulsa County Case No. CJ-2017-1400 are part of the bankruptcy estate.").

[19] *Docket No. 18*. While not wishing to delve deeply into conclusions of law at this stage of the opinion, it is worth noting that Silverstein's argument is fatally flawed in at least two respects. First of all, the United States Court of Appeals for the Tenth Circuit has ruled that "fraudulently transferred property is not part of the bankruptcy estate *until recovered*." *Rajala v. Gardner*, 709 F.3d 1031, 1039 (10th Cir. 2013) (emphasis in original). Therefore, even if the Peoria Condos could be the subject of a fraudulent transfer action, they are not at this point in time property of any bankruptcy estate of JTG that might exist. Moreover, although questioned repeatedly on this point at the hearing on the relief motion, counsel for Silverstein was unable to explain how a bankruptcy trustee would have more of a fraudulent transfer action than the fraudulent transfer action brought by Silverstein against JTG and Mr. Wolf in the State Court Action, which resulted in a judgment for $10,000. Ten thousand dollars may not be an insignificant sum standing alone, but it is hardly worth the cost of a fraudulent transfer action where lawyers (and bankruptcy trustees) have to be paid. The exact nature of the fraudulent transfer action brought by Silverstein in the State Court Action remains a mystery here, as the counterclaim filed by Silverstein in the State Court Action is not part of the record before this Court.

[20] *Docket No. 19.*

at least in the eyes of this Court from what I've heard, would be a one-creditor dispute.[21]

On December 29, 2022, this Court issued its "Order to Show Cause Why the Court Should Not Abstain From Hearing this Case" (the "OSC").[22] Under the terms of the OSC, the Court set a hearing on the issue of abstention for January 31, 2023, advised the parties that all evidence received at the hearing on Rhoades's motion for relief from the automatic stay would be considered as the Court considered the issue of abstention, and that the Court would hear further evidence, if any, from the parties at the January 31, 2023, hearing.

Rhoades and Silverstein both appeared and presented evidence at the January 31, 2023, hearing. Rhoades testified that he had in his possession a written offer to purchase the Peoria Condos for $2,750,000, and was ready, willing, and able to proceed with the sale. On cross-examination, Rhoades was asked whether title issues related to Evergreen would complicate the closing of a sale. Rhoades replied in the negative. Rhoades indicated that the only remaining issue in the State Court Action after closing of the sale would be the distribution of the sales proceeds, which would be determined by separate motion.

Silverstein's testimony was quite illuminating. He confirmed that he is the only creditor of JTG. He believes he is entitled to all the net proceeds of sale of the Peoria Condos, and, understandably, wants that number to be as high as possible.[23] Silverstein objects to the sale of the

---

[21] *Transcript, supra* note 18, page 69, line 23 – page 70, line 15.
[22] *Docket No. 41.*
[23] *Transcript of Proceedings Held on January 31, 2023, Docket No. 53*, page 31, lines 2 – 13. Silverstein also offered into evidence Exhibit 107, which he described as a contract between JTG and Cashmere Investment Management LLC, an entity owned solely by Silverstein. The document was woefully incomplete, as it was not signed by Cashmere, nor did it have attached the exhibit describing the properties it allegedly dealt with. Silverstein testified that the exhibit dealt with the Peoria Condos, but the "agreement" as presented to the Court establishes no such thing on its face. When asked to explain the purpose of the offer, counsel for Silverstein stated that the purpose was to establish that any "interests of JTG [in the Peoria Condos] are minimal," and that "[t]he interests of Mr. Silverstein are … the dominant interests here." *Id.,* page 29, lines 19 – 24. The Court takes

7

Peoria Condos in the State Court Action on the basis that there has been a transfer of the Peoria Condos to Evergreen, and Evergreen has not been served with a summons in the State Court Action.

As for the motivation behind the filing of the involuntary petition, the following portions of Silverstein's testimony are most illuminating:

> Q: Was bankruptcy your first choice in where to file the suit?
>
> A: No, it was not.
>
> Q: Tell us what happened in the state court that made you think that bankruptcy was the best choice for you?
>
> A: Well, the process in state court just seemed to be -- went on and on and on. And when I realized that not only was this title issue all messed up and causing tremendous delays, the ability for the receiver to sell the property was being stalled. I was incurring more fees in terms of Mr. Rhoades' fees, fees for his lawyers, fees for other issues involving the property. And it was obvious to me it wasn't going to be settled, certainly satisfactory to me where I can have a quick, fast, resolute sale and be able to move forward receiving the proceeds.
>
> Q: When you say you incurred fees, you're not actually paying Mr. Rhoades fees, are you?
>
> A: That is correct. When I say me, I'm referring to the estate.[24]

Clearly Silverstein was happy to be in state court (the court of his choosing) with a receiver in place until he was not, at which time he sought an alternate forum in order to displace Rhoades, block the sale of the Peoria Condos, and pass future costs of the fight onto a third party; namely, a trustee in bankruptcy. This becomes even more apparent after considering a bit more of Silverstein's testimony:

> Q: In coming to this Court, what was your intention?

---

this as further support for Silverstein's testimony that, in any event, JTG has no real economic interest in the Peoria Condos, no matter what may happen in either this Court or in the State Court Action.

[24] *Id.*, page 31, line 23 through page 32 line 15.

> A: I was hoping to expedite the process of getting the property liquidated fairly. Get my judgment paid 100 percent that I'm owed, without any other outlying disputes and reduce costs, legal fees, court costs, ongoing litigation in the state court, which no doubt, despite Mr. Rhoades' testimony that a sale might happen soon.
>
> First of all, I don't agree that it's going to happen soon. Secondly, even if it does, there's going to be significant litigation going forward, which is going to create more cost to me, and more cost to all parties involved, presumably. And the fees involved.[25]
>
> …
>
> Q: Your interests, being the other interest at issue here. You've already articulated that there'll be additional costs, you know, going forward in the state court.
>
> A: Yes.
>
> Q: You also have additional time and effort that goes into getting this resolved if you have to now bring a new lawsuit against the Evergreen Trust and litigate that in the state court, do you not?
>
> A: Absolutely I do. Yes.
>
> Q: Any ballpark of what the anticipated expense of that would be?
>
> A: No way for me to really know for sure, but I'm sure it's in the tens of thousands of dollars.
>
> Q: Something that's going to be -- would be incurred by you personally in the state court proceedings versus these proceedings?
>
> A: Yes, that's correct.[26]

The motivation behind the involuntary filing became even more clear on cross-examination:

> Q: Is it true you think this involuntary case will help you collect your judgment?
>
> A: Yes.

---

[25] *Id.,* page 41, lines 12 – 23.
[26] *Id.,* page 44, lines 2 – 19.

Q: And that's the reason you filed involuntary, isn't it?

A: That's correct.[27]

…

Q: Mr. Craige asked you about the cost to the trustee. Insofar as the statute at issue focuses on the cost to you, would it be more expensive to you to be across the street in the state court or here?

A: Clearly, of course, state court considering the litigation, moving forward.

Q: Your interests as the debtor [sic] are better off here in this court?

A: No question.[28]

Clearly, Silverstein was motivated to file the involuntary case to stop the progress of the State Court Action, based upon his belief that, while all costs of the State Court Action would be ultimately borne by him, the costs of a bankruptcy case would be passed on to an as yet unnamed trustee. No one else stands to benefit from the filing of an involuntary case for, as counsel for Silverstein noted in his closing argument, "Mr. Silverstein is really the only party who's got a substantial interest to be adjudicated."[29]

To the extent the "Conclusions of Law' contain any items that should more appropriately be considered "Findings of Fact," they are incorporated herein by this reference.

## Burden of Proof

In this case, the Court raised the issue of dismissal or abstention on its own motion, as

---

[27] *Id.*, page 45, lines 15 – 19.
[28] *Id.*, page 46, lines 21 through page 47, line 4.
[29] *Id.*, page 52, lines 5 – 6 (closing argument of Mr. Capron).

expressly allowed by statute.[30] Rhoades filed a pleading supporting dismissal or abstention,[31] and presented significant evidence in support of abstention. For the record, in considering this matter, the Court has considered Rhoades as having the burden of proof to show that abstention is warranted, and did not shift the burden to Silverstein, notwithstanding its order to show cause. In any event, the burden of proof did not come into serious play in this case.

### Conclusions of Law

Section 305(a)(1) of the Bankruptcy Code provides that "[t]he court, after notice and a hearing, may dismiss a case under this title, or may suspend all proceedings in a case under this title, at any time if— (1) the interests of creditors and the debtor would be better served by such dismissal or suspension[.]"[32] It is well established that dismissal or abstention under § 305 of the Bankruptcy Code is an extraordinary remedy, and that "[t]he party seeking relief under § 305(a) bears the burden to show that dismissal or suspension would benefit both parties."[33] This Court, along with many others, has stated that "the use of an involuntary bankruptcy filing is an improper

---

[30] That power is set forth in § 105(a):

> The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

§ 105(a). Many courts, including this one, have noted that "the issue of abstention under § 305 can be raised by the Court on its own motion." *In re ELRS Loss Mitigation, Inc.*, 325 B.R. 604, 634 (and cases cited therein) (hereafter "*ELRS*").
[31] *Docket No. 44.*
[32] § 305(a)(1).
[33] *In re General Aeronautics Corp.*, 594 B.R. 442, 480 (Bankr. D. Utah 2018) (footnote omitted).

method of resolving a two-party dispute."[34] The decision whether to abstain from hearing a particular case is left to the sound discretion of the bankruptcy court.[35]

In *In re ELRS Loss Mitigation, Inc.,* this Court identified the following four factors to be considered on the issue of abstention:

> (1) the motivation of the parties in seeking bankruptcy jurisdiction;
>
> (2) whether another forum is available to protect the interests of both parties or there is already a pending proceeding in state court;
>
> (3) the economy and efficiency of administration; and
>
> (4) the prejudice to the parties.[36]

More recently, Judge Kimball Mosier of the District of Utah utilized a seven-factor test, many of which overlap with the four factors set out in *ELRS*:

> Courts employ a totality of the circumstances test to evaluate § 305(a) motions, and modern decisions typically look at seven factors:
>
>> (1) the economy and efficiency of administration; (2) whether another forum is available to protect the interests of both parties or there is already a pending proceeding in state court; (3) whether federal proceedings are necessary to reach a just and equitable solution; (4) whether there is an alternative means of achieving an equitable distribution of assets; (5) whether the debtor and the creditors are able to work out a less expensive out-of-court arrangement which better serves all interests in the case; (6) whether a non-federal insolvency has proceeded so far in those proceedings that it would be costly and time consuming to start afresh with the federal bankruptcy process; and (7) the purpose for which bankruptcy jurisdiction has been sought.[37]

In the interests of being thorough, the Court will separately consider each of the factors contained in the *General Aeronautics* decision. The Court also reaffirms its prior statement in *ELRS* and its

---

[34] *ELRS*, 325 B.R. at 634 (footnote omitted).
[35] *Id.* (and cases cited therein).
[36] *Id.* (citing *In re Spade*, 258 B.R. 221, 231 (Bankr. D. Colo. 2001)).
[37] *In re General Aeronautics Corp.*, 594 B.R. at 480-81 (footnotes omitted) (citing *In re Monitor Single Lift I, Ltd.*, 381 B.R. 455, 464-65 (Bankr. S.D.N.Y. 2008)).

agreement with other courts who have held that bankruptcy courts are not to be used as collection tools in a two-party dispute.[38]

Silverstein takes issue with the four-factor test set forth in *ELRS*, and also, the Court presumes, the seven-factor test outlined in *General Aeronautics*, and argues instead that the inquiry under § 305(a) should be governed by the narrow view espoused by Judge Benjamin Franklin of the District of Kansas more than 40 years ago:

> This Court thinks it advisable to dismiss or suspend the proceedings only when each and every factor exists, since abstention is an extraordinary and nonappealable order. Thus, this Court will sustain a § 305 motion *only* when:
>
> > 1. The petition was filed by a few recalcitrant creditors and most creditors oppose bankruptcy;
> > 2. There is a state insolvency proceeding or other equitable and concrete out-of-court arrangement pending; and,
> > 3. Dismissal or suspension is in the best interest of the debtor and all creditors.[39]

This Court declines to follow *RAI Marketing* for several reasons. First of all, as Judge Franklin noted, at the time the *RAI* case was before him, there was little precedent or guidance regarding the interpretation of § 305(a).[40] Second, Judge Franklin was clearly concerned by the fact that his

---

[38] *See, e.g.*, *In re Mountain Dairies, Inc.*, 372 B.R. 623, 634-35 (Bankr. S.D.N.Y. 2007) ("Even if Schneider-Valley were an eligible petitioner under 11 U.S.C. § 303, this Court would be compelled to abstain pursuant to 11 U.S.C. § 305 because this is essentially a two-party dispute for which the parties have adequate remedies in state court. The bankruptcy court is not a collection agency.") (citation and footnote omitted); *In re Century Tile and Marble, Inc.*, 152 B.R. 688, 689 (Bankr. S.D. Fla. 1993) (sanctioning petitioning creditor and counsel who admittedly filed an involuntary bankruptcy case "as a collection device in lieu of filing an action in state court[.]"); *In re Persico Contracting and Trucking, Inc.*, 10-22736 RDD, 2010 WL 3766555, at *4 (Bankr. S.D.N.Y. 2010) ("With regard to the last factor [purpose for which bankruptcy jurisdiction has been sought] which again is often stated as the most important factor although not dispositive, it is frequently recognized that an involuntary Chapter 11 case particularly where that involuntary appears to be a two-party dispute; i.e., the petitioning creditors on the one hand and the debtor on the other, should not be used as a debt collection tool.").
[39] *In re RAI Mktg. Servs., Inc.*, 20 B.R. 943, 946 (Bankr. D. Kan. 1982).
[40] *Id.* at 945 ("Case law construing § 305 is sparse.").

decision regarding abstention was not reviewable by any court.[41] Such is no longer the case, as a decision to suspend or abstain from hearing proceedings is now reviewable by a district court or bankruptcy appellate panel.[42] Finally, *RAI Marketing* represents far and away the minority view on this issue, is no longer followed even in its state of origin,[43] and has been thoroughly dissected and rejected by another bankruptcy court within the Tenth Circuit.[44] The *Spade* decision, issued almost twenty years after *RAI Marketing*, is most instructive. Judge Cordova rejected the narrow test outlined in *RAI Marketing* for two reasons: first, it runs contrary to the plain meaning of the statute,[45] and secondly, the majority of cases after *RAI Marketing* use a much broader test for abstention similar to the approach this Court undertakes.[46] This Court agrees with Judge Cordova and will apply the test as described in *General Aeronautics*.

As the Court considers whether to abstain from hearing this bankruptcy case, two facts must be kept in the forefront: (1) from the perspective of debtor and creditor, this is a classic two-party dispute. The evidence is uncontradicted and affirmed time after time after time that Silverstein is the **only** creditor of JTG. There are no other creditors (save perhaps Rhoades for his fees and costs as receiver) in play in any potential bankruptcy case; and (2) JTG is a dead entity. It operates no business, has no employees, and owns no assets, save the ethereal fraudulent transfer action alluded to but never defined by Silverstein's counsel.[47] Neither the State Court Action nor a Chapter 7 bankruptcy will confer *any* benefit upon JTG.

---

[41] *Id.* at 946 .
[42] *See* § 305(c).
[43] *In re Starlite Houseboats, Inc.*, 426 B.R. 375, 387-88 (Bankr. D. Kan. 2010).
[44] *In re Spade*, 258 B.R. 221 (Bankr. D. Colo. 2001).
[45] *Id.* at 227.
[46] *Id.* at 229-30.
[47] It bears repeating that Silverstein brought a fraudulent transfer action against JTG and others in the State Court Action, for which he received a jury verdict of $10,000. This Court repeatedly asked counsel for Silverstein how a bankruptcy trustee could have a greater fraudulent transfer

14

*Economy and Efficiency of Administration*

There is no evidence to support Silverstein's argument that an involuntary bankruptcy case will operate more efficiently than the State Court Action, or serve any economic purpose other than to shift the burden of future proceedings in both time and money from Silverstein to a bankruptcy estate and a bankruptcy trustee. Indeed, Silverstein's testimony indicates that a shifting of costs away from his pocketbook is his primary goal. Silverstein's goal may be understandable, but it does not justify the involvement of this Court.

When it comes to efficiency, there is a pragmatic aspect to this case that cannot be overlooked. In a bankruptcy case, JTG is a rudderless ship, with (according to Silverstein) no possible economic interest in any assets of a potential bankruptcy estate. JTG has also proven itself an elusive entity; Silverstein could not serve a representative of JTG personally and was forced to resort to service upon the Oklahoma Secretary of State. It follows that there is no one to perform the duties of a debtor on behalf of JTG in this case; things such as filing schedules, statements of financial affairs, cooperating with and providing financial information to a bankruptcy trustee, and so on.[48] In such a situation, the bankruptcy trustee is forced to expend herculean time and effort trying to reconstruct the information necessary to allow for the administration of the bankruptcy case. This Court has experience in such cases; put simply, they do not work well, and can only be justified where the estate on its face has enough assets to ensure payment of administrative expenses and enough creditors to justify the effort.[49] This is not such a case.

---

action than the one presented in the State Court Action, and never received a straight answer. The Court fails to see how the relitigation of a $10,000 claim by a bankruptcy trustee serves an economic purpose for anyone.

[48] *See* Fed. R. Bankr. P. 1007 (duties of debtor in a Chapter 7 case).

[49] For one example of just such a case, *see Express Group Holdings LLC*, Case No 16-12039-M (Bankr. N.D. Okla. filed Nov. 9, 2016).

15

*Availability of Another Forum*

The District Court in and for Tulsa County, Oklahoma has been the home of the State Court Action since 2017 and remains readily available to conclude all matters affecting JTG and Silverstein.

*The Necessity of a Federal Proceeding (i.e., a Bankruptcy Case)*

This is a one creditor, one debtor dispute. The only alleged "asset" of JTG is an undefined fraudulent transfer action, which the Court presumes is similar (if not identical to) the fraudulent transfer action brought by Silverstein in the State Court Action. There have been no potential Chapter 5 causes of action identified that might be of benefit if this bankruptcy case proceeds.[50] The dispute between JTG and Silverstein is in good hands in the State Court Action.

*An Alternative Means of Achieving an Equitable Distribution of Assets*

Based upon the record before the Court, JTG has one and only one creditor: Silverstein. Whatever the net proceeds are in the State Court Action, Silverstein claims them as his own, and there is nothing in the record before this Court to contradict that position.[51] Again, this is a matter that can and should be decided in the State Court Action.

*The Possibility of an Out-Of-Court Settlement*

Cases that discuss this factor talk about a settlement among and between multiple creditors, i.e., cases where a debtor has multiple creditors. There is only one creditor in this case, and a pending action where all remaining issues can be resolved.

---

[50] Chapter 5 of the Bankruptcy Code contains several causes of action that exist for the benefit of a bankruptcy trustee, such as the avoidance of statutory liens (§ 545), preferential transfers (§ 547), fraudulent transfers (§ 548), and certain post-petition transactions (§ 549). No such actions have been identified in this case, as the alleged fraudulent transfer arose under Oklahoma state law.

[51] To be clear, this Court is making NO decision in that regard, leaving the same to the more than capable hands of the District Court in and for Tulsa County, Oklahoma.

*The Pendency of the State Court Action and the Costs and Delays of Starting Anew in this Court*

The existence of the State Court Action has been thoroughly documented. It has been pending since 2017, resulted in a determination that Silverstein is owed over $1,500,000 by JTG and others, and is well on its way to completion. The process for the sale of the Peoria Condos has been approved, and, according to Rhoades, completion of the sale process is imminent.[52] There is no reason to reinvent the wheel or restart the process of dealing with Silverstein, the sole creditor of JTG, simply because Silverstein is unhappy with the path of his prior choosing.

Silverstein clearly believes that a bankruptcy case will cost *him* less, but that is not the test. Were this case to go forward, a bankruptcy trustee would be required to expend considerable time and expense in order to comply with their duties, replicate what has already been done in the State Court Action and do[53] what Silverstein wants done in this court: sell the Peoria Condos.

*The Purpose for Which Bankruptcy Jurisdiction Has Been Sought*

Silverstein was quite candid about the motivation behind the filing of this involuntary petition: he no longer wished to have Rhoades be the person in charge of selling the Peoria Condos, he wanted to reduce or eliminate his out-of-pocket expenses, and he wanted to prevent the sale

---

[52] As of the issuance of this Memorandum Opinion, the sale process may be complete, as a hearing to confirm the sale process was set for early March 2023 in the State Court Action.

[53] To be clear, it is far from a given that a bankruptcy trustee would choose the path that Silverstein would choose for them; namely, file a fraudulent transfer action against Evergreen (or whoever supposedly holds title to the Peoria Condos), prevail in that action, recover the Peoria Condos, care for and maintain the Peoria Condos pending sale, and ultimately sell the Peoria Condos. Remember, the value of a fraudulent transfer claim against JTG and Mr. Wolf has already been established by a jury in the State Court Action at the sum of $10,000. Moreover, there is no one to benefit from a trustee's efforts except Silverstein, much in the same way he stands to recover in the State Court Action. Bankruptcy trustees are authorized to "abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate." § 554(a). It is entirely possible that a trustee would find the alleged fraudulent transfer action to be an asset of inconsequential value. Finally, Rhoades has received relief from the automatic stay to proceed with the State Court Action, a fact which may also cause a trustee to find Silverstein's proposed course of action to be a fool's folly.

process contemplated in the State Court Action from going forward. Let us not forget that the structure of the State Court Action is entirely a creature of Silverstein's own choosing: he filed the counterclaim against JTG and Mr. Wolf, sought and obtained the appointment of Rhoades as receiver, used the State Court Action to reduce his claim against JTG and Mr. Wolf to judgment, and initially supported the efforts of Rhoades to sell the Peoria Condos. When he became unhappy with the litigation path he had chosen, with Rhoades and the progress of the State Court Action, he sought a mulligan in this Court. There is a simple name for this conduct: forum shopping. It is not to be countenanced.

## Conclusion

This Court finds, after considering each factor outlined in *General Aeronautics*, that the test for abstention under § 305(a) has been overwhelmingly satisfied. Abstention is not only warranted, but is demanded by the facts and equities of this case.

The involuntary Chapter 7 petition brought by Steven B. Silverstein against JTG Ventures, LLC is hereby dismissed. A separate judgment consistent with this Memorandum Opinion shall be entered concurrently herewith.

Dated this 16th day of March, 2023.

BY THE COURT:

TERRENCE L. MICHAEL, CHIEF JUDGE
UNITED STATES BANKRUPTCY COURT

7807.7